# 22-624

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 22-624

DR. LUCILLE LEVIN, SUZELLE M. SMITH, as Trustee of the
Jeremy Isadore Levin 2012 Revocable Trust, as amended,

*Plaintiffs-Third-Party-Defendants-*
*Cross-Defendants-Appellants*,

JEREMY LEVIN,

*Plaintiff*,

THE BANK OF NEW YORK MELLON,

*Third-Party-Plaintiff-Counter-Defendant*,

(*Caption continued on inside covers*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2677

SAMUEL DOLINGER,
BENJAMIN H. TORRANCE,
  *Assistant United States Attorneys,*
    *Of Counsel.*

—v.—

BANK OF NEW YORK, SOCIETE GENERALE CORPORATE & INVESTMENT BANKING, BNP PARIBAS, COMMERZBANK AG, JOHN BECKER, THE ESTATE OF ANTHONY BROWN, JOHN R. CUDDLEBACK, KATHY HODGES, RICHARD H. MENKINS, (BROTHER) RICHARD SCHNORF, (FATHER) ROBERT SCHNORF, JP MORGAN CHASE, JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., AHME BUYUK, JPMORGAN CHASE BANK, N.A./LONDON,

*Defendants-Third-Party-Plaintiffs-Counter-Defendants-Appellees*,

CITIBANK,

*Defendant-Third-Party-Plaintiff-Counter-Defendant-Third-Party-Defendant-Cross-Defendant-Appellee*,

JENNY RUBIN, DEBORAH RUBIN, NORMAN RUBIN, ABRAHAM MENDELSON, STUART E. HERSH, RENAY FRYM,

*Third-Party-Defendants-Cross-Defendants-Consolidated-Third-Party-Defendants*,

REDACTED THIRD-PARTY DEFENDANT, TERRANCE VALORE, CATHRINE BONK HUNT, JOHN BONK, SR., KEVIN BONK, THOMAS BONK, LISA DIGIOVANNI, MARION DI GIOVANNI, ROBERT DIGIOVANNI, DANIELLE DIGIOVANNI, SHERRY LYNN FIEDLER, ROBERT FLUEGEL, THOMAS A. FLUEGEL, MARILOU FLUEGEL, EVANS HAIRSTON, FELICIA HAIRSTON, JULIA BELL HAIRSTON, HENRY HUKILL, MARK ANDREW HUKILL, MATTHEW SCOTT HUKILL, MELISSA HUKILL, MEREDITH ANN HUKILL, MITCHELL CHARLES HUKILL, MONTE HUKILL, VIRGINIA ELLEN HUKILL, STORM JONES, PENNI JOYCE, CARL KIRKWOOD, SR., JEFF KIRKWOOD, SHIRLEY KIRKWOOD, CARL A. KIRKWOOD, PATRICIA KRONENBITTER, JAMES MACGROGLOU, LORRAINE MACGROGLOU, BILL MACGROUGLOU, BETTY LAISE, KATHY MCDONALD, EDWARD W. MCDONOUGH, SEAN MCDONOUGH, EDWARD J. MCDONOUGH, ROSE ROTONDO, ESTATE OF, LUIS ROTONDO, PHYLLIS SANTOSERRA, DEBORAH RHOSTO, ROBERT SIMPSON, RENEE EILEEN SIMPSON, LARRY SIMPSON, SR. ANNE MARIE SIMPSON, SALLY JO WIRICK, JUANITA R. GOLDFARB, DAVID A. BATTLE, ESTATE OF, MARY V. HERNANDEZ, MATILDE HERNANDEZ, ESTATE OF, ROBERT MIFFLER, JR. JOHN MUFFLER, ESTATE OF, JUTTA YARBER, JAMES YARBER, ESTATE OF, RONALD I. TISHMACK, JOHN JAY TISHMACK, ESTATE OF, DOROTHY WINT, CELIA WALKER, DOROTHY C.

WINT PEDRO ALVARADO, JR. ANDRES ALVARADO TULL, ANGEL ALVARADO, GERALDO ALVARADO GRISSELLE ALVARADO, LUIS ALVARADO, LUISA ALVARADO, MARIA ALVARADO, MARTA ALVARADO, MINERVA ALVARADO, YOLANDO ALVARADO, ZORAIDA ALVARADO, DENNIS LACK ANDERSON, FLOYD MARTIN CARPENTER, MICHAEL HARRIS, ROSE HARRIS, DONALD R. PONTILLO, DEBORAH TRUE, DOUGLAS PONTILLO, LEONORA PONTILLO, JOHN E. SELBE, ELOISE F. SELBE, BELINDA SKARKA, DON SELBE, JAMES SELBE, WILLY G. THOMPSON, ALLISON THOMPSON, IFALINE THOMPSON, CHERYL BASS, JOHNNY THOMPSON, WANDA FORD, ORLANDO MICHAEL VALORE, SR., ORLANDO M. VALORE, JR., JANICE VALORE, MARCY LYNN PARSON, TIMOTHY BROOKS, EDWARD J. BROOKS, PATRICIA A. BROOKS, ESTATE OF MICHAEL HEISER, FRANCIS HEISER, GARY HEISER, HERMAN C. MARTHALER, III, KATIE L. MARTHALER, SHARON MARTHALER, KIRK MARTHALER, KATHLEEN M. WOOD, RICHARD M. WOOD, ANTHONY W. CARTRETTE, DENISE M. EICHSTAEDT, LEWIS W. CARTRETTE, ESTATE OF PATRICK FENNIG, CATHERINE FENNIG, Individually and as Personal Representative of the Estate of Patrick Fening, MARK FENNIG, PAUL D. FENNIG, ESTATE OF CHRISTOPHER ADAMS, CATHERINE ADAMS, Individually and as Personal Representative of the Estate of Christopher Adams, MARY YOUNG, DANIEL ADAMS, ELIZABETH WOLF, PATRICK ADAMS, JOHN ADAMS, WILLIAM ADAMS, MICHAEL ADAMS, ESTATE OF THANH GUS NGUYEN, Individually and as Personal Representative of the Estate of Thanh Gus Nguyen, SANDRA M. WETMORE, BRIDGET BROOKS, JAMES RIMKUS, ANNE RIMKUS, ESTATE OF KENDALL KITSON, JR., KENDALL KITSON SR., Individually and as Personal Representative of the Estate of Kendall Kitson, NANCY R. KITSON, Individually and as Personal Representative of the Estate of Kendall Kitson Jr., STEVEN K. KITSON, NANCY A. KITSON, LAWRENCE TAYLOR, STARLINA TAYLOR, ESTATE OF JOSHUA WOODY, DAWN WOODY, BERNADINE R. BEEKMAN, TRACEY M. SMITH, JONICA L. WOODY, TIMOTHY WOODY, IBIS "JENNY" HAUN, Individually and as Personal Representative of the Estate of Leland "Tim" Haun, ESTATE OF LELAND TIMOTHY HAUN, SENATOR HAUN, MILLY PEREZ-DALLIS, ESTATE OF CHRISTOPHER LESTER, CECIL H. LESTER, CECIL LESTER, JR., JESSICA LESTER, SHYRL JOHNSON, Individually and as Personal Representative of the Estate of Kevin Johnson, Sr, NICHOLAS JOHNSON, ESTATE OF PETER MORGERA, MICHAEL, MORGERA, INDIVIDUALLY OF THE, THOMAS MORGERA, ESTATE OF MILLARD DEE CAMPBELL, MARIE CAMPBELL, Individually and as Personal Representative of the

Estate of Millard Dee Campbell, BESSIE CAMPBELL, ESTATE
OF JUSTIN WOOD, ESTATE OF EARL CARTRETTE, JR. ESTATE
OF BRIAN MCVEIGH, ESTATE OF JEREMY TAYLOR, JAMES
WETMORE, GEORGE BEEKMAN, CHE G. COLSON, LAURA
JOHNSON, SEALED-THIRD PARTY DEFENDANT, THE BANK
OF TOYKO-MITSUBISHI UFJ, LTD. (LONDON BRANCH), THE
ESTATE OF JAMES SILVIA AND LYNNE MICHOL SPENCER,
THE BANK OF TOKYO-MITSUBISHI UFJ, LTD. (NEW YORK
BRANCH), JOSEPH A. BARILE, ANGELA E. BARILE, MICHAEL
BARILE, ANDREA CIARLA, ANN MARIE MOORE, ANGELA
YOAK, VARA BROWN, JOHN BROWN, SULBA BROWN, ROWEL
BROWN, MARVINE MCBRIDE, LAJUANA SMITH, RODNEY E.
BURNS, JEANNIE SCAGGS, EUGENE BURNS, DAVID BURNS,
DANIEL CUDDEBACK, JR., DANIEL CUDDEBACK, SR., BARBARA
CUDDEBACK, ROBERT DEAN, MICHAEL EPISCOPO, RANDY
GADDO, PETER GADDO, GADDO BLATTER, THE ESTATE OF
WILLIM R. GAINES, JR., MICHAEL A. GAINES, CAROLYN SPEARS,
WILLIAM R. GAINES, SR., EVELYN SUE SPEARS ELLIOT,
CAROL WEAVER, THE ESTATE OF VIRGEL HAMILTON,
GLORIA HAMILTON, BRUCE HASTING, MARY JEAN HODGE,
MAYNARD HODGES, LORRETA BROWN, CINDY HOLMES,
SHANA SAUL, DANIEL JOY, SEAN KIRKPATRICK, JOSEPH T.
KREMER, JACQUELINE STAHRR, THE ESTATE OF CHRISTINE
KREMER, THE ESTATE OF THOMAS KREMER, THE ESTATE
OF DAVID A. LEWIS, BETTY LEWIS, JERRY L. LEWIS, SCOTT M.
LEWIS, PAUL MARTINEZ, SR., TERESA GUNTERH, ESTHER
MARTINEZ PARKS, ALPHONSO MARTINEZ, DANIEL MARTINEZ,
MICHAEL MARTINEZ, PAUL MARTINEZ, JR., JOHN OPATOVSKY,
STEVEN G. OWEN, ALBERT PAGE, JANET PAGE, JOSEPH
PENOSKY, CHRISTIAN R. RAUCH, THE ESTATE OF BURTON
WHERLAND, THE ESTATE OF JEFFREY BRUCE OWEN, THE
ESTATE OF MICHAEL LEE PAGE, LEONARD PAUL TICE,
CHARLES F. WEST, CHARLES H. WEST, RICK WEST, GREGORY
WHERLAND, KIMMY WHERLAND, SARAH WHERLAND,
SUSANNE YEOMAN, IBIS S. HAUN, ALAN HAYMAN, SHIRLEE
HAYMAN, KATHLEEN M. WOOD, , BRIDGET BROOKS, ESTATE
OF JOSEPH E. RIMKUS, ESTATE OF KEVIN J. JOHNSON,
BRUCE JOHNSON, K.J., A MINOR, , N.A.J, A MINOR, SHYRL L.
JOHNSON, MICHAEL T. ADAM, ESTATE OF PETER J.
MORGERA, ESTATE OF THANH VAN NGUYE, MARY YOUNG,
DONTE AKILI MWAIPAPE, DONTI AKILI MWAIPAPE, DEBORA
DONTI MWAIPAPE, ELISHA DONTI MWAIPAPE, NKO DONTI
MWAIPAPE, VICTORIA DONTI MWAIPAPE, JUDY LESTER,
LAWRENCE TAYLOR, STARLINA D. TAYLOR, VICKI L. TAYLOR,
MONICA AKILI, ESTATE OF ABDU YUSUPH SHAMTE DNANGE,
ESTATE OF ABDUL SHABANI MTUYLA, ESTATE OF JUMA
YUSUPH SHAMTE DNANGE, ESTATE OF MTENDEJE RAJABU,

ESTATE OF MWAJABU YUSUPH SHAMTE DNANGE, ESTATE OF ROGATH SAIDI SAIDI, ESTATE OF SAIDI SHABANI MTUYLA, ESTATE OF YUSUF SHAMTE NDANGE, ANGELINA MATHEW FELIX, ABELLA VALENTINE KATUNDA, DEISERY VALENTINE MATHE KATUNDA, DIANA VALENTINE KATUNDA, EDWINE VALENTINE MATHE KATUNDA, VALENTINE MATHEW KATUNDA, VEIDIANA VALENTINE KATUNDA, VENANT VALENTINE MATHE KATUNDA, CECILIA SAMUEL MARCUS, CORONELLA SAMUEL MARCUS, SAMUAL THOMAS MARCUS, ANGELINA MATHEW-FERIX, SHABANI SAIDI MTULYA, AKILI MUSUPAPE, ALLI KINDAMBA NG'OMBE, ADABETH SAID NANG'OKO, HANUNI RAMADHANI NDANGE, MOHAMED ALLI NG'OMBE, KINDAMBA ALLI NG'OMBE, EDWARD MATHEW RUAHESHELWA, ANGELINA MATHEW RUTAHESHELWA, ELISABETH MATHEW RUTAHESHELWA, ENOC MATHEW RUTAHESHELWA, ERIC MATHEW RUTAHESHELWA, HAPPINESS MATHEW RUTAHESHELWA, EILEEN PRINDEVILLE AHLQUIST, MIRALDA, (JUDITH MAITLAN ALARCON, MARVIN ALBRIGHT, JARNAAL MUATA ALI, ANNE ALLMAN, DIANNE MARGARET ALLMAN, JOHN ROBERT ALLMAN, MARGARET E. ALVAREZ, MARGARET ANGELONI, KIMBERLY F. ANGUS, JESUS ARROYO, MILAGROS ARROYO, PABLO ARROYO, ANTHONY BANKS, DONNIE BATES, ESTATE OF AISHA MAWAZO, ESTATE OF DANIEL ROGATH SAIDI, ESTATE OF DOTIO RMADHANI, ESTATE OF IDIFONCE ROGATH SAIDI, ESTATE OF JOHN ROGATH SAIDI, ESTATE OF MAJALIWA RAMADHANI, ESTATE OF RENEMA RAMADHANI, ESTATE OF SELINA ROGATH SAIDI, ESTATE OF UPEMDO RAMADHANI, ESTATE OF VERONICA ALOIS SAIDI, ESTATE OF WENGO RAMADHANI, KULWA RAMADHANI, JOHNNY BATES, LAURA BATES, MARGIE BATES, MONTY BATES, RONNY KENT BATES, THOMAS C. BATES, SR., MARY E. BAUMGARTNER, ANTHONY BAYNARD, BARRY BAYNARD, EMERSON BAYNARD, JAMES BAYNARD, PHILIP BAYNARD, STEPHEN BAYNARD, THOMASINE BAYNARD, TIMOTHY BAYNARD, WAYNE BAYNARD, JESS W. BEAMON, ANNA BEARD, MARY ANN BECK, ALUE BELRNER, ALVIN BURTON BELRNER, ANNETTE BELRNER, CLARENCE BELRNER, COLBY KEITH BELRNER, DONNA BELRNER, FAYE BELRNER, KENNETH BELRNER, LUDDIE BELRNER, SHAWN BIELLOW, MARY FRANCIS BLACK, DONALD BLANKENSHIP, SR., MARY BLANKENSHIP, (ESTATE OF), RICHARD D. BLANKENSHIP, ALICE BLOCKER, DOUGLAS BLOCKER, JOHN R. BLOCKER, ROBERT BLOCKER, JOSEPH BOCCIA, JOSEPH J. BOCCIA, SR., RAYMOND BOCCIA, JOHN, JR., RICHARD BOCCIA, RONNIE BOCCIA, (VERONICA), LETICIA BODDIE, ANGELA BOHANNON, ANTHONY BOHANNON, CARRIE BOHANNON, DAVID BOHANNON, EDNA BOHANNON, LEON BOHANNON, RICKI

BOHANNON, LEON BOHANNON, JOHN BONK, JR., JEFFREY
JOSEPH BOULOS, JOSEPH BOULOS, LYDIA BOULOS, MARIE
BOULOS, REBECCA BOWLER, JOHN NORMAN BOYETT,
LAVON BOYETT, JOHN NORMAN BOYETT, (ESTATE OF),
THERESA U. ROTH BOYETT, WILLIAM A. BOYETT, SUSAN
SCHNORF BREEDEN, DAMION BRISCOE, CHRISTINE BROWN,
ROSANNE BRUNETTE, MARY LYNN BUCKNER, CLAUDE
BURLEY, MYRA BURLEY, WILLIAM BURLEY, WILLIAM
DOUGLAS BURLEY, RODNEY DARRELL BURNETTE, (ESTATE
OF), KATHLEEN CALABRO, RACHEL CALDERA, AVENELL
CALLAHAN, MICHAEL CALLAHAN, PAUL CALLAHAN, PATRICIA
CALLOWAY, (PATSY ANN), ELISA ROCK CAMARA, CANDACE
CAMPBELL, BRADLEY CAMPUS, CLARE CAMPUS, ELAINE
CAPOBIANCO, OLYMPIA CARLETTA, KIMBERLY CARPENTER,
FLORENE MARTIN CARTER, PHYLLIS A. CASH, THERESA
CATANO, BRUCE CEASAR, FRANKLIN CEASAR, FREDRICK
CEASAR, JOHNNIE CEASAR, ROBBIE NEIL CEASAR, SYBIL
CEASAR, CHRISTINE DEVLIN CECCA, TAMMY CHAPMAN,
JAMES CHERRY, SONIA CHERRY, ADELE H. CHIOS, JANA M.
CHRISTIAN, SHARON ROSE CHRISTIAN, SUSAN CIUPASKA,
LESHUNE STOKES CLARK, ROSEMARY CLARK, MARY ANN
COBBLE, KAREN SHIPP COLLARD, JENNIFER COLLIER,
DEBORAH M. COLTRANE, CHRISTOPHER COMES, FRANK
COMES, SR., FRANK COMES, JR., JOAN COMES, PATRICK
COMES, JAMES N. JR CONLEY, ROBERT ALLEN CONLEY,
ROBERTA LI CONLEY, CHARLES F. COOK, CHARLES DENNIS
COOK, ELIZABETH A. COOK, MARY A. COOK, ALAN TRACY
COPELAND, (ESTATE OF), BETTY COPELAND, DONALD
COPELAND, JOHNNY LEN COPELAND, BLANCHE CORRY,
DAVID COSNER, HAROLD COSNER, JEFFREY COSNER, LEANNA
COSNER, MARVA LYNN COSNER, CHERYL COSSABOOM,
(ESTATE OF), BRYAN THOMAS COULMAN, DENNIS P.
COULMAN, CHRISTOPHER J. COULMAN, KEVIN COULMAN,
LORRAINE M. COULMAN, TIMOTHY GADDO, DANIEL KREMER,
TOMASITA L. MARTINEZ, JOYCE CLIFFORD, DAVID PENOSKY,
SHARON DAVIS, ALAN C. ANDERSON, MICHAEL ANDERSON,
THELMA ANDERSON, STEPHEN BOYD BLAND, ESTATE OF
FRANK BLAND, RUTH ANN BLAND, JAMES BLAND, ESTATE
OF LAURA VIRGINA COPELAND, SIDNEY DECKEY, IDA
DECKER, DUDLEY DECKER, JOHNNIE DECKER, CAROLYN
MUDD, RONALD DUPLANITY, ESTATE OF SEAN F. ESTER,
LOUIS ESTLER, JR., MARY ELLEN ESTLER, ESTATE OF
BENJAMIN E. FULLER, ELLAINE ALLEN, ERNEST C. FULLER,
JOHN GIBSON, HOLLY GIBSON, MAURICE GIBSON, ESTATE
OF MICHAEL HASTINGS, JOYCE HASTINGS, ESTATE OF PAUL
HEIN, CHRISTOPHER HEIN, JO ANN HEIN, KAREN HEIN-
SULLIVAN, VICTOR J. HEIN, JACQUELINE M. KUNYSZ, ESTATE

OF JOHN HENDRICKSON, JOHN HENDRICKSON, TYSON
HENDRICKSON, DEBORAH RYAN, ESTATE OF BRUCE
HOLLINGSHEAD, TYSON HENDRICKSON, MELINDA
HOLLINGSHEAD, RENARD MANLEY, ESTATE OF MICHAEL
ROBERT MASSMAN, NICOLE GOMEZ, ANGELA MASSMAN,
KRISTOPHER MASSMAN, LYDIA MASSMAN, PATRICIA LOU
SMITH, ESTATE OF LOUIS MELENDEZ ZAIDA MELENDEZ,
DOUGLAS JASON MELENDEZ, JOHNNY MELENDEZ, JOHNNY
MELENDEZ, JR., ESTATE OF MICHAEL MERCER, SARAH
MERCER, SAMUEL PALMER, ROBIN NICELY, ESTATE OF JUAN
C. RODRIGUEZ, LOUISA PUNONET, ROBERT RUCKER,
ESTATE OF BILLY SAN PEDRO, CESAR SAN PEDRO, SILA V.
SAN PEDRO,  GUILLERMO SAN PEDRO, JAVIER SAN PEDRO,
THURNELL SHIELDS, EMANUEL SIMMONS, ESTATE OF
JAMES SURCH, PATTY BARNETT, WILL SURCH, BRADLEY
ULICK, JEANETTE DOUGHERTY, MARILYN PETERSON,
ESTATE OF ERIC WALKER, TENA WALKER-JONES, RONALD E.
WALKER, GALEN WEBER, ESTATE OF OBRIAN WEEKES,
ANSON EDMOND, ARNOLD EDMOND, ARNOLD EDMON,
HAZEL EDMOND, WENDY EDMOND, FAITH WEEKES, KEITH
WEEKES, IANTHE WEEKES, META WEEKES, ESTATE OF
DENNIS LLOYD WEST, KATHY WEST, ESTATE OF JOHN WEYL,
KELLY BACHLOR, ROBIN BROCK,  MORGAN BROCK, MORGAN
W. ROWAN, SHARON J. ROWAN, NELSON WEYL, THE
INTERNATIONAL BANK OF AZERBAIJAN-MOSCOW LLC,
CARLOS ACOSTA, MARIA ACOSTA, TOVA ETTINGER, IRVING
FRANKLIN, BARUCH KAHANE, LIBBY KAHANE, CIPORAH
KAPLAN, STEVEN M. GREENBAUM, CATHERINE BONK,
ESTATE OF, SANDRA GOFF, GARY ROBERT OWENS, JAMES
OWENS, BARK F. PRESSLEY, DAVID A. PRESSLEY, MICHAEL F.
PRESSLEY, THOMAS C. PRESSLEY, YASEMIN B. PRESSLEY,
FRANK B. PRESSLEY, JR., MONTINE BOWEN, SERPI BUYUK,
SUNDUS BUYUK, TULAY BUYUK, BAHAR BUYUK, FRANK
PRESSLEY, SR. JOHN B. PRESSLEY, MARC Y. PRESSLEY,
DOROTHY WILLARD, CHERYL L. BLOOD, TABITHA CARTER,
ALEXANDRA RAIN COMIER, ANDREW JOHN WILLIAM
COMIER, ANDREW JOHN WILLIAM COMIER, MICHAEL JAMES
CORMIER, PATRICIA K. FAST, PATRICIA FEORE, LORIE GULIK,
ALICE M. HIRM, CLYDE M. HIRN, INEZ P. HIRN, JULITA A.
QUALICO, JOYCE REED, WHORLEY LEE REED, HOWARD
SPARKS, HOWARD SPARKS JR., LESLIE LYDIA SPARKS,
MICHAEL RAY SPARKS, GARY O. SPIERS, VICTORIA Q. SPIERS,
VICTORIA J. SPIERS, FLOSSIE VARNEY, LINDA JANE
WHITESIDE, RITH ANN WHITESIDE, PAT WILLIAMS, NOAM
ROSENMAN, ELENA ROZENMAN, TZVI ROZENMAN, BENNIE
HARRIS, ESTATE OF BINYAMIM KAHANE, ESTATE OF IRMA
FRANKLIN, ESTATE OF MEIR KAHANE, KEITH ESTLER,

ETHEL J. GRIFFIN, SONIA KAHANE, RONALS WALKER JR. JAMES S. SPEARS, MARK, SPEARS, ESTATE OF MOSES ARNOLD, JR., LOLITA M. ARNOLD, ESTATE OF DAVID L. BATTLE, LISA ANN BECK, BETTY J. BOLEN, KEITH EDWIN BOLEN, NEALE SCOTT BOLEN, SHELDON H. BOLEN, SHARLA M. KORZ, ESTATE OF LEONARD WARREN WALKER, ESTATE OF WALTER EMERSON WINT, JR. JEAN GIVEN OWEN, DONTE AKILI MWAIPAPE, ELISHA DONTI MWAIPAPE, NKO DONTI MWAIPAPE, VICTORIA DONTI MWAIPAPE, DONALD BLANKENSHIP, JR., JOHN W. BLOCKER, JAMES BOCCIA, BILLIE JEAN BOLINGER, CHARLITA MARTIN COVINGTON, DEBORAH CRAWFORS, AMANDA CROUCH, MARIE CRUDALE, RICK CRUDALE, EUGENE F. CYZICK, RUSSELL CYZICK, LYNN DALLACHIE, BARBARA DAVIS, ANN DEAL, LYNN SMITH DERBYSHIRE, DESJARDINS, CHRISTINE DEVLIN, DANIEL DEVLIN, GABRIELLE DEVLIN, MICHAEL DEVLIN, RICHARD DEVLIN, SEAN DEVLIN, GLENN DOLPHIN, ROSALIE MILANO DONAHUE, ASHLEY DORAY, NATHANIEL DORSEY, REBECCA DOSS, CLAUDINE DUNNIGAN, ELIZABETH ANN DUNNIGAN, RICHARD W. WOOD, ESTATE OF BRENT MARTHALER, MARIE R. CAMPBELL, ELIZABETH ADAMS, CHRISTOPHER R. NGUYEN, Individually and as Personal Representative of the Estate of Thanh Gus Nguyen,

*Third-Party-Defendants-Counter-Claimants-Cross-Defendants-Cross-Claimants*,

DEBORAH PETERSON, Personal Representative of the Estate of James C. Knipple, *et al.*,

*Third-Party-Defendant-Counter-Claimant.*

# TABLE OF CONTENTS

PAGE

Interest of the United States. . . . . . . . . . . . . . . . . . .  1

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  Legal Principles of Foreign Sovereign
        Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    B.  Factual Background . . . . . . . . . . . . . . . . . . .  7

    C.  The District Court's Decision. . . . . . . . . . .  9

ARGUMENT—Foreign Sovereign Property Located
    Abroad Is Not Subject to Execution. . . . . . . . .  11

    A.  TRIA Does Not Permit Execution on Foreign
        Sovereign Property Outside the United
        States. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    B.  Plaintiffs Cannot Seek a Turnover Order
        Under New York Law to Execute Against
        Foreign Sovereign Property Outside the
        United States . . . . . . . . . . . . . . . . . . . . . . .  16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

ii

# TABLE OF AUTHORITIES

*Cases*:

*Astoria Federal Savings & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) . . . . . . . . . . . . . . . . . . . . . . . 19

*Aurelius Capital Partners, LP v.*
  *Republic of Argentina*,
  584 F.3d 120 (2d Cir. 2009) . . . . . . . . . . . . . . . . 21

*Autotech Technologies LP v. Integral Research &*
  *Development Corp.*,
  499 F.3d 737 (7th Cir. 2007) . . . . . . . . . .   3, 20, 22

*Bennett v. Islamic Republic of Iran*,
  825 F.3d 949 (9th Cir. 2016) . . . . . . . . . . . . . . . . 8

*Bolivarian Republic of Venezuela v.*
  *Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017). . . . . . . . . . . . . . . . . . . . . 27

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001). . . . . . . . . . . . . . . . . . . . . . . . 14

*Cisneros v. Alpine Ridge Grp.*,
  508 U.S. 10 (1993). . . . . . . . . . . . . . . . . . . . . . . . 14

*Clearstream Banking S.A. v. Peterson*,
  140 S. Ct. 813 (2020). . . . . . . . . . . . . . . . . . . . 10, 23

*Connecticut Bank of Commerce v. Republic of Congo*,
  309 F.3d 240 (5th Cir. 2002) . . . . . . . . . . . . *passim*

*De Letelier v. Republic of Chile*,
  748 F.2d 790 (2d Cir. 1984) . . . . . . . . . . . . . . . . 18

iii

PAGE

*Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen*,
    43 F.2d 705 (2d Cir. 1930) . . . . . . . . . . . . . . . . . 17

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012) . . . . . . . . . . . . . . . . 21

*Estates of Ungar ex rel. Strachman v.*
    *Palestinian Authority*,
    715 F. Supp. 2d 253 (D.R.I. 2010) . . . . . . . . . . . 23

*Ex parte Peru*,
    318 U.S. 578 (1943). . . . . . . . . . . . . . . . . . . . . . . 22

*Federal Republic of Germany v. Philipp*,
    141 S. Ct. 703 (2021). . . . . . . . . . . . . . . . . . . . 13, 26

*Harrison v. Republic of Sudan*,
    838 F.3d 86 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 7

*Inter-Regional Financial Group, Inc. v. Hashemi*,
    562 F.2d 152 (2d Cir. 1977) . . . . . . . . . . . . . . . . 23

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952). . . . . . . . . . . . . . . . . . . . . . . 20

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013). . . . . . . . . . . . . . . . . 12, 14, 15

*Koehler v. Bank of Bermuda Ltd.*,
    577 F.3d 497 (2d Cir. 2009) . . . . . . . . . . . . . 10, 16

*Koehler v. Bank of Bermuda Ltd.*,
    911 N.E.2d 825 (N.Y. 2009) . . . . . . . . . . . . . . . . 16

*Ministry of Defense & Support for the Armed Forces of*
    *the Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009). . . . . . . . . . . . . . . . . . . 14, 16

PAGE

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010) . . . . . . . . . . . . . . . . . . . . . 10, 12

*New York & Cuba Mail Steamship Co. v.
Republic of Korea*,
132 F. Supp. 684 (S.D.N.Y. 1955) . . . . . . . . . . . 17

*Permanent Mission of India to the United Nations v.
City of New York*,
551 U.S. 193 (2007) . . . . . . . . . . . . . . . . . . . . . . . 3

*Persinger v. Islamic Republic of Iran*,
729 F.2d 835 (D.C. Cir. 1984) . . . . . . . . . . . . . . . 26

*Peterson v. Islamic Republic of Iran*,
876 F.3d 63 (2d Cir. 2017) . . . . . . . .   10, 23, 24, 25

*Peterson v. Islamic Republic of Iran*,
963 F.3d 192 (2d Cir. 2020) . . . . . . . . . . . . . . 10, 23

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) . . . . . . . . .   3, 19, 20

*Reeves v. Federal Savings & Loan Ins. Corp.*,
732 S.W.2d 380 (Tex. App. 1987) . . . . . . . . . . . . . 23

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014) . . . . . . . . . . . . . . . . . . . *passim*

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . . . . . . 3

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) . . . . . . . . . . . . . . . . . . . . . . 2, 21

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008) . . . . . . . . . . . . . . . . . . . . . . . 19

v

PAGE

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) . . . . . . . . . . . . . . 21

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016). . . . . . . . . . . . . . . . . 12, 15, 16

*Rodriguez v. United States*,
   480 U.S. 522 (1987). . . . . . . . . . . . . . . . . . . . . . . . 16

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018). . . . . . . . . . . . . . . . . . . *passim*

*Rubin v. Islamic Republic of Iran*,
   830 F.3d 470 (7th Cir. 2016) . . . . . . . . . . . . . . . . 20

*Samantar v. Yousuf*,
   560 U.S. 305 (2010). . . . . . . . . . . . . . . . . . . . *passim*

*Schooner Exchange v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) . . . . . . . . . . . . . . . 3

*Smith v. Federal Reserve Bank of New York*,
   346 F.3d 264 (2d Cir. 2003) . . . . . . . . . . . . . 13, 14

*United States v. Alaska*,
   503 U.S. 569 (1992). . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Holy Land Foundation for
   Relief & Development*,
   722 F.3d 677 (5th Cir. 2013) . . . . . . . . . . . . . . . 14

*United States v. Moore*,
   916 F.3d 231 (2d Cir. 2019) . . . . . . . . . . . . . . . . 24

*United States v. Texas*,
   507 U.S. 529 (1993). . . . . . . . . . . . . . . . . . . . . . . 20

vi

PAGE

*Verlinden B.V. v. Central Bank of Nigeria,*
    461 U.S. 480 (1983). . . . . . . . . . . . . . . . . . . . . . . . 3

*Statutes*:

28 U.S.C. § 1330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1605 . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 19

28 U.S.C. § 1605A. . . . . . . . . . . . . . . . 4, 5, 6, 11, 20

28 U.S.C. § 1607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . 5, 17, 18, 24, 25

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 4301 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

National Defense Authorization Act for
    Fiscal Year 2008,
    Pub. L. No. 110-181, 122 Stat. 3 . . . . . . . . . . . . . 5

National Defense Authorization Act for
    Fiscal Year 2020,
    Pub. L. No. 116-92, 113 Stat. 1198 (2019) . . . . . 23

vii

PAGE

Terrorism Risk Insurance Act of 2002,
Pub. L. No. 107-297, as amended . . . . . . . . *passim*

N.Y. C.P.L.R. 5225 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rules*:

Fed. R. Civ. P. 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Regulations*:

31 C.F.R. Part 544 . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

31 C.F.R. Part 560 . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 C.F.R. § 560.211 . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 C.F.R. § 560.326 . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Notice of OFAC Sanctions Actions,
85 Fed. Reg. 18,334 (Apr. 1, 2020) . . . . . . . . . . . 8

*Executive Materials*:

Presidential Determination No. 2003-23,
68 Fed. Reg. 26,459 (May 7, 2003) . . . . . . . . . . . 13

*Legislative Materials*:

H.R. Rep. No. 94-1487 (1976) . . . . . . . . . . . . . . . . 3, 18

*International Materials*:

European Convention on State Immunity,
ETS No. 74 (entered into force June 11, 1976),
https://rm.coe.int/16800730b1 . . . . . . . . . . . . . . . 27

viii

PAGE

Report of the Sixth Committee to the General
    Assembly, United Nations Convention on the
    Jurisdictional Immunities of States and
    Their Property,
    U.N. Doc. A/59/508 (Nov. 30, 2004),
    https://treaties.un.org/doc/source/docs/A_59_508-
    E.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Report of the International Law Commission
    on the Work of Its Forty-Third Session,
    U.N. Doc. A/46/10 (1991),
    https://legal.un.org/ilc/documentation/english/reports/
    a_46_10.pdf.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United Nations Treaty Collection, United Nations
    Convention on Jurisdictional Immunities of States
    and Their Property (Dec. 2, 2004),
    https://treaties.un.org/doc/Publication/MTDSG/
    Volume%20I/Chapter%20III/III-13.en.pdf . . . .  28

*Other Authorities*:

Restatement (Fourth) of Foreign
    Relations Law § 432 (2018)  . . . . . . . . . . . . . . . . 27

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 22-624

---

### BRIEF FOR THE UNITED STATES
### AS *AMICUS CURIAE*

---

### Interest of the United States

Plaintiffs in this case are the family members of a victim of terrorism who hold a judgment against the Islamic Republic of Iran. They seek to execute that judgment against assets outside the United States that they assert belong to an instrumentality of the Iranian government.

The United States emphatically condemns the terrorist actions that gave rise to plaintiffs' claims and expresses its sympathy for the victims and their families. The government remains committed to aggressively pursuing those responsible for violence against U.S. nationals and stands unequivocally against the state sponsorship of terrorism. Nevertheless, the United States respectfully submits this *amicus curiae* brief in support of affirming the district court's order denying plaintiffs' request.

This case implicates the government's interests in the proper application of principles of foreign sovereign immunity under both the Foreign Sovereign Immunities Act of 1976 ("FSIA") and federal common

2

law, as well as the interpretation of a federal statute, the Terrorism Risk Insurance Act of 2002 ("TRIA"). Those issues, and more generally litigation involving foreign states in U.S. courts, can have significant ramifications for the United States' foreign relations, and may affect the reciprocal treatment of the United States in the courts of other nations. Because the district court correctly interpreted TRIA and applied the law of foreign sovereign immunity, its decision should be affirmed.

## Issues Presented

1. Whether TRIA permits execution on a foreign state's property outside the United States.

2. Whether principles of sovereign immunity preclude execution on a foreign state's property outside the United States, even if that execution would otherwise be permitted by state law.

## Statement of the Case

### A. Legal Principles of Foreign Sovereign Immunity

"The doctrine of foreign sovereign immunity" originally "developed as a matter of common law." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). For much of the Nation's history, principles adopted by the Executive Branch determined the immunity of foreign states in civil suits in courts of the United States. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945). Until 1952, the Executive Branch adhered to the "absolute" theory of sovereign immunity, under

3

which foreign states could not be sued without their consent, and foreign sovereign property was entirely shielded from attachment and execution. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010); *see also Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) (Marshall, C.J.).

In 1952, the Executive Branch adopted the "restrictive" theory of foreign sovereign immunity, under which foreign states were granted immunity from suit for their sovereign or public acts but not their private or commercial acts. *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007). However, the change in executive policy "had little, if any, impact on federal courts' approach to immunity analyses," because "'[a]s in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004) (quoting *Verlinden*, 461 U.S. at 487). Moreover, even after 1952, the "property of foreign states [remained] absolutely immune from execution." H.R. Rep. No. 94-1487 ("House Report") at 27 (1976). "This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech Technologies LP v. Integral Research & Development Corp.*, 499 F.3d 737, 749 (7th Cir. 2007); *accord Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002).

4

In 1976, Congress "codif[ied] the restrictive theory of sovereign immunity" in the FSIA. *Samantar*, 560 U.S. at 313. The FSIA, 28 U.S.C. §§ 1330, 1602 *et seq.*, was intended to strike a "careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018). The FSIA governs foreign states' immunity from suit ("jurisdictional immunity"), as well as the immunity of foreign states' property in the United States from execution or attachment ("execution immunity"). However, in instances where "a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324.

The FSIA's jurisdictional immunity provision, 28 U.S.C. § 1604, provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," subject to exceptions provided in 28 U.S.C. §§ 1605-1607. Section 1605A, which is known as the "terrorism exception," abrogates foreign sovereign immunity for suits seeking money damages for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," if the foreign state was designated "as a state sponsor of terrorism" by the Secretary of State "at the time the act . . . occurred" or "as

5

a result of such act." 28 U.S.C. § 1605A(a)(1), (2)(A)(i)(I).[1]

The FSIA's execution immunity provision, 28 U.S.C. § 1609, provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in [28 U.S.C. §§] 1610 and 1611." The principal exceptions in § 1610 specify that "property in the United States" belonging to a foreign state or its agency or instrumentality "shall not be immune" from execution under specified circumstances. *Id.* § 1610(a), (b). Section 1611 identifies certain types of foreign sovereign property that are immune from attachment and execution "[n]otwithstanding the provisions of section 1610."

Section 1610 contains two terrorism-related exceptions to execution immunity. The first exception provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from" attachment or execution upon a judgment of a U.S. court, if "the judgment relates to a claim for which the foreign state is not immune" under the terrorism exception—*i.e.*, § 1605A or its predecessor—"regardless of whether the property is or was involved with the act upon which

―――――――

[1] Before 2008, a prior version of the terrorism exception was codified at 28 U.S.C. § 1605(a)(7). *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. A, Tit. X, § 1083, 122 Stat. 3, 338.

6

the claim is based." 28 U.S.C. § 1610(a)(7). The second exception permits attachment of and execution against the "property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity," where "the judgment relates to a claim for which the agency or instrumentality is not immune" under the terrorism exception, "regardless of whether the property is or was involved in the act upon which the claim is based." 28 U.S.C. § 1610(b)(3).

Additionally, FSIA § 1610(g) provides that "the property of a foreign state against which a judgment is entered under" the terrorism exception, § 1605A, "and the property of an agency or instrumentality of such a state, . . . is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section." 28 U.S.C. § 1610(g). However, this provision "serves to identify property that will be available for attachment and execution in satisfaction of a § 1605A judgment, but it does not in itself divest property of immunity." *Rubin*, 138 S. Ct. at 820. Rather, the provision "operates only when the property at issue is exempt from immunity as provided elsewhere in § 1610." *Id.*

Finally, TRIA § 201 provides that, "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under" the FSIA's terrorism exception, "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of

execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a) (codified as amended at 28 U.S.C. § 1610 note). A "terrorist party" includes "a terrorist, a terrorist organization . . . , or a foreign state designated as a state sponsor of terrorism." *Id.* § 201(d). "Blocked assets" are assets that the United States has seized or frozen under certain sanctions regimes. *See id.* § 201(d)(2). Transactions involving blocked assets are generally prohibited without a license or other authorization issued by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). *See generally* 31 C.F.R. Part 560; *see* 31 C.F.R. §§ 560.211, 560.326 (Iranian Transactions and Sanctions Regulations) (prohibiting attachment and execution without a license or other authorization). TRIA, however, overrides that prohibition and facilitates the ability of terrorism victims to attach those assets. *See Harrison v. Republic of Sudan*, 838 F.3d 86, 96-98 (2d Cir. 2016), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

## B. Factual Background

According to their supplemental complaint, plaintiffs hold a judgment of nearly $29 million against the Islamic Republic of Iran, arising from the 1984 kidnapping of Jeremy Levin "by Hezbollah terrorists who received training, support, aid, funding, and direction from" Iran. (Joint Appendix ("JA") 2, 7, 23).

Plaintiffs allege that in 2018, in response to discovery requests, defendants JPMorgan Chase Bank, N.A.,

8

and JPMorgan Chase Bank, N.A./London (together, "JPMorgan") advised them of the existence of an "Iranian Blocked Asset which ha[d] not been previously disclosed to Plaintiffs, located at [JPMorgan's] London branch, JPMorgan Chase Bank, N.A./London." (JA 3, 10-11). According to JPMorgan, the account in question contains funds belonging to Bank Melli, an "Iranian bank wholly owned by the Iranian government," and held "$94,561.55 in funds as of January 31, 2018." (JA 69-70). This account (the "Melli account") was "blocked in 2010 under the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544," administered by OFAC. (JA 70). The Melli account is an asset in which Iran has an interest that has been blocked by OFAC, which plaintiffs claim renders it "subject to execution or attachment in aid of execution of Plaintiffs' judgment." (JA 12-16); *see Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954, 957 (9th Cir. 2016) (Bank Melli is "wholly owned by the government of Iran" and is an "instrumentality of Iran"), *abrogated on other grounds by Rubin*, 138 S. Ct. 816; *see also* Notice of OFAC Sanctions Actions, 85 Fed. Reg. 18,334, 18,337 (Apr. 1, 2020) (designating Bank Melli as an entity "placed on OFAC's Specially Designated Nationals and Blocked Persons List" pursuant to Exec. Order No. 13,224, § 1(d)(i) (Sept. 23, 2001), for providing support to the Islamic Revolutionary Guard Corps —Qods Force, which was determined to be subject to the Executive Order).

In their supplemental complaint, plaintiffs requested an order enforcing their judgment against Iran by directing JPMorgan to "transfer to the United States and pay to Plaintiffs the monies" in the Melli

9

account. (JA 4-6, 17-20). JPMorgan moved to dismiss, arguing that the district court lacked subject matter jurisdiction and that the complaint failed to state a claim for relief. (JA 67-68). At least for purposes of the motion to dismiss, JPMorgan did not dispute that Bank Melli is an instrumentality of Iran and that the funds in the account appear to belong to Bank Melli. (JA 119). Furthermore, JPMorgan in London consented to personal jurisdiction for purposes of the litigation with the plaintiffs here, and did not dispute that the Melli account was blocked by OFAC. (JA 119).

## C. The District Court's Decision

The district court (J. Paul Oetken, J.) granted JPMorgan's motion to dismiss, concluding that the Melli account "is immune from execution under the [FSIA] because it is located outside of the United States." (Special Appendix ("SPA") 4). The district court, following the Supreme Court's holding in *Rubin*, held that FSIA § 1610(g)—which renders "the property of a foreign state" against which a terrorism-related judgment is entered "subject to . . . execution[ ] upon that judgment as provided in this section"—"does not provide a freestanding basis to attach and execute against the property of a foreign state," but requires a separate exception from immunity of the sovereign's property against execution. (SPA 4 (citing *Rubin*, 138 S. Ct. at 819)).

The district court concluded that TRIA § 201 does not provide such an exception to execution immunity. (SPA 5-6). That provision renders "the blocked assets of [a] terrorist party . . . subject to execution . . . in order

10

to satisfy" a "judgment against a terrorist party on a claim based upon an act of terrorism," TRIA § 201(a), "without reference to whether the assets must be in the United States" (SPA 5). This is "[u]nlike most of FSIA § 1610's provisions, which explicitly strip immunity from kinds of property 'in the United States.'" (SPA 5). However, the district court held that under the "presumption against extraterritorial application," TRIA's silence "falls short of the 'clear indication' needed to apply it to an extraterritorial asset." (SPA 5 (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010))).

The district court declined to adopt the reasoning of this Court's opinion in *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 876 F.3d 63 (2d Cir. 2017), which was later vacated by the Supreme Court, *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020) (granting petition, vacating judgment, and remanding). As the district court noted, on remand "[f]ollowing the Supreme Court's vacatur of *Peterson II*, the Second Circuit chose not to reinstate its prior analysis that allowed for attachment and execution against an extraterritorial asset under the FSIA and TRIA." (SPA 6 (citing *Peterson v. Islamic Republic of Iran* ("*Peterson III*"), 963 F.3d 192, 196 (2d Cir. 2020))). The district court also distinguished *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014), where the dispute concerned "whether extraterritorial assets were immune from execution discovery, not from actual attachment or execution." (SPA 6). Last, the court concluded that *Koehler v. Bank of Bermuda Ltd.*, 577 F.3d 497 (2d Cir. 2009)—where this Court held that New York law permitted a court in New York to "order

11

a bank over which it had personal jurisdiction to de-
liver stock certificates owned by a judgment debtor to
a judgment creditor when those stock certificates"
were located abroad—"did not concern the property of
a foreign sovereign or a foreign sovereign's instrumen-
tality," and did not involve the FSIA or TRIA, which
would preempt state law to the extent they were in
conflict. (SPA 7-8).

## A R G U M E N T

### Foreign Sovereign Property Located Abroad
### Is Not Subject to Execution

The question in this appeal is whether plaintiffs,
who hold a judgment against Iran, can execute that
judgment on assets belonging to an instrumentality of
Iran that are located outside the United States.
Plaintiffs advance two theories to avoid sovereign im-
munity, but neither supports their ability to execute
on the Melli account.

### A. TRIA Does Not Permit Execution on Foreign
### Sovereign Property Outside the United States

Plaintiffs primarily rely on TRIA § 201(a), which,
as described above, provides that "[n]otwithstanding
any other provision of law," the blocked assets of a
state sponsor of terrorism against whom a judgment
has been entered under § 1605A or its predecessor
"shall be subject to execution or attachment in aid of
execution in order to satisfy such judgment to the ex-
tent of any compensatory damages for which such ter-
rorist party has been adjudged liable." 28 U.S.C.

12

§ 1610 note. Because plaintiffs hold a judgment against Iran under the terrorism exception, and because the Melli account is a blocked asset (JA 70), plaintiffs contend that TRIA § 201(a) allows execution against that asset.

But as the district court observed, § 201(a) is silent on whether it applies outside the United States. (SPA 5). The statutory silence is fatal to plaintiffs' claim that TRIA's revocation of execution immunity applies to an asset located abroad. "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. "The question is not whether [a court] think[s] Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute will do so." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 335 (2016). Because § 201(a) gives no indication whatsoever—much less a "clear," "affirmative[]," and "unmistakabl[e]" one—that it applies to property located abroad, it does not.

Indeed, plaintiffs' efforts to apply § 201(a) to overseas property belonging to a foreign sovereign implicate a core rationale for the presumption against extraterritorial application of statutes: that presumption "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Even in the context of actions against state sponsors of terrorism, execution

13

on a foreign sovereign's property located abroad could provoke serious foreign policy consequences, including impacts on the treatment of the United States' own property abroad. *See Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021) ("statutes affecting international relations" should be interpreted "to avoid, where possible, producing friction in our relations with other nations and leading some to reciprocate" (quotation marks and alterations omitted)). Execution could also lead to the diversion of foreign sovereign assets that might otherwise be used to serve critical United States foreign policy objectives. *See Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 269, 271 (2d Cir. 2003) (noting presidential action making "inapplicable with respect to Iraq" laws that "appl[y] to countries that have supported terrorism" to preserve Iraqi funds for reconstruction and other related purposes; citing Presidential Determination No. 2003-23, 68 Fed. Reg. 26,459 (May 7, 2003)). Accordingly, a clear statement from Congress endorsing extraterritorial application would be required before judgment creditors can seek to execute upon foreign sovereign property abroad.

That § 201(a) begins with the phrase "[n]otwithstanding any other provision of law" does not change that conclusion. That clause serves the purpose of "supersed[ing] conflicting non-attachment provisions of other statutes." *Smith*, 346 F.3d at 271; *accord Rubin*, 138 S. Ct. at 824 (clause overrides "provisions otherwise granting immunity"). Similarly, it eliminates the effect of other barriers to execution with the force of law, such as the presidential waiver of executability of certain blocked assets authorized in 28

14

U.S.C. § 1610(f). *See Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). But the clause cannot be read, as plaintiffs contend, to allow "execution on *all* blocked assets of a terrorist state," or to "preclude *any* restriction on such execution." (Brief for Plaintiffs-Appellants ("Br.") 11 (emphasis added)); *see United States v. Holy Land Foundation for Relief & Development*, 722 F.3d 677, 688 (5th Cir. 2013) (rejecting "interpretation of TRIA § 201's 'notwithstanding' clause that operates to override all statutes that, *by their purpose or effect*, shield assets from attachment or execution"). Rather, the "notwithstanding" clause "applies only when some 'other provision of law' conflicts with TRIA." *Smith*, 346 F.3d at 271; *see Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (a "notwithstanding" clause "override[s] conflicting provisions of any other section" of statutory text). The presumption against extraterritoriality is not a "provision of law"—rather, it is a "canon of statutory interpretation," *Kiobel*, 569 U.S. at 115, "designed to help judges determine the Legislature's intent as embodied in particular statutory language," *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Such "guides" to the correct reading of a statute, *id.*, do not prohibit the use of blocked property for execution on a judgment, and therefore do not "conflict" with TRIA.

Plaintiffs seek to avoid the presumption against extraterritoriality by insisting that TRIA "is not silent" on its application outside the United States. (Br. 22-26). They point to the statute's definition of "blocked assets," which refers to the Trading with the Enemy Act, 50 U.S.C. § 4301 *et seq.*, and the

15

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1702; in turn, Executive Orders issued under IEEPA have been used to block assets both at domestic and foreign branches of U.S. banks. But that is not enough to make TRIA apply extraterritorially. A statute's reference to another statute with extraterritorial effect may be sufficient to overcome the presumption against extraterritoriality, but that situation is "rare," and occurs only when that reference provides a "clear, affirmative indication" that Congress intended to include foreign activity. *RJR Nabisco*, 579 U.S. at 338-41. In *RJR Nabisco*, the Court found that clear, affirmative indication where the Racketeer Influenced and Corrupt Organizations Act defined racketeering activity to include a number of predicates that expressly applied to foreign conduct, including at least one predicate that applied *only* to extraterritorial conduct. *Id.* at 338-40. By contrast, the mere fact that a statute may cover activity "either within or outside the United States" is not sufficient to "imply extraterritorial reach." *Kiobel*, 569 U.S. at 118. TRIA's references to IEEPA—a statute that can be used to block property both inside and outside the United States—therefore does not establish that TRIA applies extraterritorially. Nor does the fact that TRIA states that it applies "in every case in which a person has obtained a judgment" under the terrorism exception, or that it defines blocked assets to include "any asset seized or frozen" under IEEPA, *see* TRIA § 201(a), (d)(2): "it is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality," *Kiobel*, 569 U.S. at 118.

16

Even though plaintiffs' interpretation of TRIA might be more favorable to victims of terrorism, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam). "Congress had a more complicated set of purposes in mind" in enacting TRIA than simply "enabl[ing] victims of terrorism to collect on judgments they have won against terrorist parties." *Elahi*, 556 U.S. at 383. Because TRIA does not contain a "clearly expressed congressional intent to the contrary," it has "only domestic application," *RJR Nabisco*, 579 U.S. at 335, and does not permit execution against foreign sovereign property outside the United States.

## B. Plaintiffs Cannot Seek a Turnover Order Under New York Law to Execute Against Foreign Sovereign Property Outside the United States

Plaintiffs separately argue that New York state law permits them to execute on the assets held in the Melli account. (Br. 26-33). But because foreign state property outside the United States is protected by sovereign immunity against execution, state law does not permit plaintiffs to seek a turnover order against the Melli account.

In a suit between private parties, New York C.P.L.R. 5225(b) authorizes a court to order a bank over which it has personal jurisdiction to deliver a judgment debtor's assets located outside New York to a judgment creditor. *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 830-31 (N.Y. 2009); *see Koehler*, 577 F.3d at 499 (certifying question to New York Court of

17

Appeals); Fed. R. Civ. P. 69 (adopting state-law execution procedures in federal actions). However, *Koehler*'s rule does not apply here, because that case "did not concern the property of a foreign sovereign or a foreign sovereign's instrumentality." (SPA 7).

Because this case involves the property of a foreign sovereign's instrumentality, principles of foreign sovereign immunity prohibit plaintiffs' attempt at execution. The FSIA itself does not apply—its execution immunity provisions only govern foreign state property "in the United States," and are silent as to property outside the United States. 28 U.S.C. §§ 1609-1610. But that does not suggest that there is no execution immunity for foreign sovereign property abroad. Rather, common law sovereign immunity principles that predate the FSIA continue to preclude execution by judgment creditors against foreign sovereign property outside the United States.

Before the enactment of the FSIA, foreign sovereign property, no matter where it was found, enjoyed complete execution immunity in U.S. courts. Even in cases where a foreign sovereign "consent[ed] to be sued," and where "a valid judgment ha[d] been entered," courts did not permit execution on the "property of a sovereign government." *Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705, 706-08 (2d Cir. 1930). That did not change after the Executive Branch adopted the restrictive theory of sovereign immunity in 1952: foreign sovereigns continued to have "complete immunity . . . from execution against their property" by judgment creditors. *Connecticut Bank of Commerce*, 309 F.3d at 252; *see New York &*

18

*Cuba Mail Steamship Co. v. Republic of Korea*, 132 F. Supp. 684, 685-86 (S.D.N.Y. 1955) (adhering to the State Department's "direct and unequivocal position" that the shift to the restrictive theory of sovereign immunity did not affect execution immunity).

In enacting the FSIA, Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property even in cases where a judgment could be had on the merits." *Connecticut Bank of Commerce*, 309 F.3d at 252. Rather, the FSIA "lift[ed] execution immunity [only] 'in part.'" *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984) (quoting House Report at 8); *see also* House Report at 27. In doing so, Congress provided for certain exceptions to the existing rule of execution immunity for foreign sovereign property within the United States—but those exceptions were carefully limited. *See* 28 U.S.C. §§ 1609-1610. It would make no sense to conclude that Congress meticulously delineated the circumstances under which execution on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for assets located abroad. The execution immunity of foreign sovereign property abroad "simply was not the particular problem to which Congress was responding when it enacted the FSIA." *Samantar*, 560 U.S. at 323. Thus, because execution abroad "is not governed by the [FSIA]," it remains "barred by foreign sovereign immunity under the common law." *Id.* at 324.

That understanding is confirmed by reading the FSIA as a whole. The FSIA's exceptions to execution

19

immunity are "narrower" than the exceptions to juris-
dictional immunity. *NML Capital*, 573 U.S. at 142. For
example, the FSIA abrogates jurisdictional immunity
for suits "based upon a commercial activity carried on
in the United States by the foreign state," 28 U.S.C.
§ 1605(a)(2), but the corresponding execution-
immunity exception applies only to property that "is or
was used for the commercial activity upon which the
claim is based" in the United States, 28 U.S.C.
§ 1610(a)(2). The statute thus contemplates that some
judgment creditors will "have to rely on foreign states
to voluntarily comply with U.S. court judgments,"
*Peterson*, 627 F.3d at 1128, as was true before the
FSIA. The narrower scope of the execution immunity
exceptions reflects a judgment that authorizing execu-
tion against a sovereign's property is a greater intru-
sion on state sovereignty than merely exercising juris-
diction. *See Republic of Philippines v. Pimentel*, 553
U.S. 851, 866 (2008) (discussing the "specific affront
that could result" to a state from seizing its property
"by the decree of a foreign court"); *Connecticut Bank of
Commerce*, 309 F.3d at 255-56 ("[A]t the time the FSIA
was passed, the international community viewed exe-
cution against a foreign state's property as a greater
affront to its sovereignty than merely permitting juris-
diction over the merits of an action."); *Peterson*, 627
F.3d at 1128 (recognizing the "special sensitivities
implicated by executing against foreign state
property").

In addition, Congress "is understood to legislate
against a background of common-law . . . principles,"
*Astoria Federal Savings & Loan Ass'n v. Solimino*, 501
U.S. 104, 108 (1991), and to abrogate those principles,

20

"the statute must 'speak directly' to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534 (1993); *accord Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."). The FSIA contains no such clear statement; to the contrary, "[t]he FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world." *Autotech*, 499 F.3d at 750. "[S]ome hint from Congress" would be necessary for a court to "adopt[ ] such a breathtaking assertion of extraterritorial jurisdiction." *Id.*; *cf. Rubin*, 138 S. Ct. at 825 ("Out of respect for the delicate balance that Congress struck in enacting the FSIA, we decline to read into the statute a blanket abrogation of attachment and execution immunity for § 1605A judgment holders absent a clearer indication of Congress' intent." (construing § 1610(g))).

Accordingly, every decision of a court of appeals that has addressed the issue, apart from a now-vacated opinion of this Court, treated the presence of foreign sovereign property in the United States as a prerequisite to execution in U.S. courts. *See Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir. 2016) (identifying as one of the "basic criteria" for attachment that the foreign sovereign property "must be within the territorial jurisdiction of the district court"), *aff'd*, 138 S. Ct. 816 (2018); *Peterson*, 627 F.3d at 1131-32 (foreign state property abroad is "not

'property in the United States'" and is therefore "immune from execution" (quoting 28 U.S.C. § 1610(a)(7))); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("a district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries"); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("property that is subject to attachment and execution must be property in the United States of a foreign state" (quotation marks omitted)); *Connecticut Bank of Commerce*, 309 F.3d at 247 (U.S. courts "may execute only against property that meets" specified criteria, including that the property be "'in the United States'" (quoting 28 U.S.C. § 1610(a)(1)); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("section 1610 does not empower United States courts to levy on assets located outside the United States").[2]

──────────

[2]  Consistent with pre-FSIA practice, to the extent that there were any question about the appropriate application of sovereign immunity in particular instances, the courts may rely on suggestions of immunity from the Executive Branch. Sensitive diplomatic and foreign policy judgments are involved in determining the appropriate scope of such immunity, which are judgments ordinarily committed to the Executive as an aspect of the Executive Branch's prerogative to conduct foreign affairs on behalf of the United States. *See Hoffmann*, 324 U.S. at 35-36. Such suggestions "must be accepted by the courts as a conclusive

22

The Supreme Court's opinion in *NML Capital*, 573 U.S. 134, is not to the contrary. *NML Capital* presented the "single, narrow question" whether the FSIA limits the scope of post-judgment discovery in aid of execution when the judgment debtor is a foreign state. 573 U.S. at 140. In concluding that the FSIA does not confer immunity from "discovery of information concerning extraterritorial assets," *id.* at 145 n.4, the Court did not address whether such assets are subject to execution in U.S. courts. The Court instead justified discovery as a means of determining whether foreign sovereign property abroad might be "executable under the relevant jurisdiction's law," *id.* at 144, which accords with the usual practice for seeking to enforce the judgment of a U.S. court in a foreign jurisdiction, *see, e.g.*, *Autotech*, 499 F.3d at 751 ("If assets exist in another country, the person seeking to reach them must try to obtain recognition and enforcement of the U.S. judgment in the courts of that country."). Nothing about the Court's holding or reasoning suggests that it would allow execution in U.S. courts against extraterritorial foreign sovereign assets.

In *Peterson II*, a panel of this Court was incorrectly persuaded that *NML Capital* "squarely rejected the

––––––––––

determination by the political arm of the Government." *Ex parte Peru*, 318 U.S. 578, 588-89 (1943). As the Supreme Court has recognized, Congress did not intend to eliminate this function of the Executive Branch with respect to matters outside of the scope of the FSIA. *Samantar*, 560 U.S. at 323.

23

argument that any common law execution immunity afforded to 'a foreign state's extraterritorial assets' survived the enactment of the FSIA." 876 F.3d at 90 (quoting *NML Capital*, 573 U.S. at 144). Based on this conclusion, and in reliance on *Koehler*, *Peterson II* held that creditors could seek a turnover order directing a bank holding foreign sovereign assets outside the United States to bring those assets into the United States in aid of execution. 876 F.3d at 91.[3] However, *Peterson II* carries no weight: it was vacated by the Supreme Court after the intervening enactment of legislation, *see Clearstream Banking S.A.*, 140 S. Ct. 813 (citing National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, Div. A, Title XII, § 1226, 113 Stat. 1198, 1645-46 (2019)), and this Court chose not to reinstate its reasoning on remand, *Peterson III*, 963 F.3d at 196. A vacated opinion "has

---------

3 New York law is not unique in this regard: courts applying the law of a number of states have entered turnover orders that affect property held outside the jurisdiction, including "in other countries." *Inter-Regional Financial Group, Inc. v. Hashemi*, 562 F.2d 152, 154 (2d Cir. 1977) (order to deliver stock certificates under Connecticut law); *see, e.g.*, *Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 715 F. Supp. 2d 253, 263 (D.R.I. 2010) (order to turn over funds in Israel under Rhode Island law); *Reeves v. Federal Savings & Loan Ins. Corp.*, 732 S.W.2d 380, 381 (Tex. App. 1987) (order to turn over real property in Portugal under Texas law).

24

no precedential value." *United States v. Moore*, 916 F.3d 231, 241 (2d Cir. 2019).

Nor is *Peterson II* of persuasive value given its flawed reasoning. The panel pointed to the statement in *NML Capital* that "'any sort of immunity defense made by a foreign sovereign in an American court must stand on the [FSIA's] text. Or it must fall.'" 876 F.3d at 89 (quoting 573 U.S. at 141-42). But the panel read that statement to mean more than it can bear in context. As described above, the Supreme Court was considering whether the FSIA, which includes express provisions for jurisdictional and execution immunity, could also be understood to contain an implicit "third provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets" when the statute "says not a word on the subject." 573 U.S. at 142-43. *NML Capital* held that the FSIA's "silence" regarding immunity from discovery in aid of execution means that no such immunity exists. But it is incorrect to conclude, as the *Peterson II* panel did, that the Supreme Court has held that the FSIA completely "supersedes the pre-existing common law of foreign sovereign immunity." 876 F.3d at 89 (quotation marks omitted). To the contrary, when "a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324.

The *Peterson II* panel further misunderstood *NML Capital* when it relied on the Supreme Court's instruction that "even if" a foreign state's extraterritorial assets were immune from execution under pre-FSIA law, "then it would be obvious that the terms of § 1609

execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States.*'" *NML Capital*, 573 U.S. at 144. The panel read that to mean that the FSIA vitiated case law prior to *NML Capital* that foreign sovereign property outside the United States is not subject to execution in U.S. courts. *Peterson II*, 876 F.3d at 91-93. But that is incorrect: the Supreme Court was responding to the argument that "§ 1609 execution immunity implies coextensive discovery-in-aid-of-execution immunity," and reasoned that, because the FSIA itself, in § 1609, does not establish immunity for foreign sovereign assets abroad, then neither does the FSIA itself confer immunity from discovery about those assets. *NML Capital*, 573 U.S. at 144. The Court did not say that the FSIA abrogated whatever immunity from actual execution those assets would have enjoyed prior to enactment of the FSIA, nor that the FSIA forecloses whatever immunity from actual execution those assets now would enjoy independent of the FSIA.[4]

––––––––––

[4] In addition, the *NML Capital* Court did not address the procedural mechanism discussed in *Peterson II*—whether a U.S. court might leverage its exercise of personal jurisdiction over a litigant in the United States to require the litigant to bring foreign sovereign property to the United States for execution. To the contrary, the Court's analysis rested on the assumption that U.S. courts "generally lack authority . . . to execute against property in other countries." *NML*

26

For all those reasons, there is no indication that in enacting the FSIA, Congress intended to implement, *sub silentio*, a wholesale revocation of execution immunity for foreign sovereigns' property abroad. Not only is that result inconsistent with the history of foreign sovereign immunity and the text and structure of the FSIA, it would lead to the anomaly of U.S. law providing greater immunity when a foreign state's property is located in this country—where the exceptions to execution immunity are quite limited, *see* 28 U.S.C. § 1610—than when the property is located abroad, including in the foreign state's own territory. Such a result could in turn put U.S. property at risk, given the possibility of reciprocal adverse treatment of the United States in foreign courts. *See Philipp*, 141 S. Ct. at 714 (permitting suit against foreign governments in U.S. courts may "lead[ ] some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation" (quotation marks omitted)); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984) ("some foreign states base their sovereign immunity decisions on reciprocity").

Lastly, adopting the view that there is no execution immunity for extraterritorial sovereign assets would be inconsistent with customary international law. The FSIA "for the most part embodies basic principles of

––––––––––

*Capital*, 573 U.S. at 144. No party appears to have raised the possibility of such a means of execution, and the Court accordingly had no occasion to address it.

27

international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (citing *Schooner Exchange*, 11 U.S. (7 Cranch) at 136-37). "Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of that other state." Restatement (Fourth) of Foreign Relations Law § 432 (2018). The United States accepts that this principle reflects a widely accepted international norm and practice. *See United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992) (accepting principle as customary international law based on government's representation that the United States recognized it as such). Moreover, this principle is reflected in other international agreements; for instance, the European Convention on State Immunity provides that "[n]o measures of execution or preventive measures against the property of a Contracting State may be taken [without its consent] in the territory of another Contracting State." European Convention on State Immunity, art. 23, ETS No. 74 (entered into force June 11, 1976), https://rm.coe.int/16800730b1. The United Nations Convention on the Jurisdictional Immunities of States and Their Property contains a similar prohibition on execution upon the property of a state, without that state's consent, "in connection with a proceeding before a court of another State," except if the relevant property "is in the territory of the

State of the forum."[5] That this principle is generally accepted by the international community is confirmed by the fact that the government is not aware of any foreign state that, either at the time of the FSIA's enactment or now, allows judgment creditors to reach a

_____

[5] Report of the Sixth Committee to the General Assembly, United Nations Convention on the Jurisdictional Immunities of States and Their Property, art. 19(c), U.N. Doc. A/59/508 (Nov. 30, 2004), https://treaties.un.org/doc/source/docs/A_59_508-E.pdf; *see* Report of the International Law Commission on the Work of Its Forty-Third Session, commentary on art. 18, para. 6, U.N. Doc. A/46/10 (1991) ("[B]efore any measures of constraint are implemented, a proceeding to that effect should be instituted before a court of the State where the property is located."), https://legal.un.org/ilc/documentation/english/reports/a_46_10.pdf. The Convention on Jurisdictional Immunity is not yet in force and the United States has not signed it. *See* United Nations Treaty Collection, United Nations Convention on Jurisdictional Immunities of States and Their Property (Dec. 2, 2004), https://treaties.un.org/doc/Publication/MTDSG/Volume%20I/Chapter%20III/III-13.en.pdf (last visited Nov. 10, 2022). While the United States considers the prohibition on execution upon sovereign property outside of the forum of the foreign court to be widely accepted international practice, it takes no position on whether other aspects of article 19(c) of the Convention also embody customary international law principles.

29

foreign sovereign's extraterritorial assets to satisfy a judgment against that foreign sovereign.

## CONCLUSION

**The judgment of the district court should be affirmed.**

Dated:     New York, New York
                November 10, 2022

                         Respectfully submitted,

                         DAMIAN WILLIAMS,
                         *United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States as*
                         *Amicus Curiae.*

SAMUEL DOLINGER,
BENJAMIN H. TORRANCE,
        *Assistant United States Attorneys,*
                *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6,892 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: SAMUEL DOLINGER,
*Assistant United States Attorney*